# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

ADRIANA GAULDEN,         )
                                   )
     Plaintiff,           )
                                   )
v.                          )     **Case No. 3:20-cv-01002**
                                   )     **Judge Aleta A. Trauger**
PHILIPS NORTH AMERICA LLC,  )
                                   )
     Defendant.         )

## MEMORANDUM

Plaintiff Adriana Gaulden filed suit against Philips North America LLC ("Philips") in November 2020, asserting claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, for racial harassment—more specifically, for creating a racially hostile work environment—and retaliation for complaining about perceived racial harassment. The defendant has now filed its Motion for Summary Judgment (Doc. No. 22) along with a supporting Memorandum of Law, Statement of Undisputed Material Facts, and numerous exhibits (Doc. Nos. 23–25). It seeks judgment in its favor on both claims. The plaintiff filed a Response, Response to the Statement of Undisputed Material Facts, her own Statement of Additional Facts, and additional exhibits. (Doc. Nos. 27–29.) The defendant filed a Reply, as well as a Response to the plaintiff's Statement of Additional Facts. (Doc. Nos. 30, 31.)

For the reasons set forth herein, the court will grant the defendant's motion and dismiss this case.

## I.    STANDARD OF REVIEW

Summary judgment is appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "By its very terms,

this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine.'" *Id.*

A fact is "material" within the meaning of Rule 56(a) "if its proof or disproof might affect the outcome of the suit under the governing substantive law." *Reeves v. Swift Trans. Co.*, 446 F.3d 637, 640 (6th Cir. 2006). A genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Harris v. Klare*, 902 F.3d 630, 634–35 (6th Cir. 2018).

The party bringing the summary judgment motion has the initial burden of identifying portions of the record—including, *inter alia*, depositions, documents, affidavits, or declarations— that it believes demonstrate the absence of a genuine dispute over material facts. *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627–28 (6th Cir. 2018); Fed. R. Civ. P. 56(c)(1)(A). The non-moving party must set forth specific facts showing that there is a genuine issue for trial. *Pittman*, 901 F.3d at 628.

The court should view the facts and draw all reasonable inferences in favor of the non-moving party. *Id.* Credibility judgments and weighing of evidence are improper. *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018). As noted above, where there is a genuine dispute as to any material fact, summary judgment is not appropriate. *Id.* The court determines whether sufficient evidence has been presented to make the issue of fact a proper jury question. *Id.* The mere existence of a scintilla of evidence in support of the nonmoving party's position will be

insufficient to survive summary judgment; rather, there must be evidence upon which the jury could reasonably find for the nonmoving party. *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003).

## II.     FACTUAL AND PROCEDURAL BACKGROUND

The facts set forth herein for which no citation is provided are derived from the plaintiff's Response to Defendant's Statement of Undisputed Material Facts (Doc. No. 28) or the defendant's Response to Plaintiff's Statement of Additional Facts (Doc. No. 31). Unless otherwise indicated, the facts recited herein are undisputed for purposes of the Motion for Summary Judgment.

### A.     Plaintiff Begins Her Employment at Philips

Plaintiff Adriana Gaulden, who is African American, was hired by Philips in October 2018. Her supervisor was Shannon Stithem. Stithem is White. Initially, Gaulden got along well with Stithem. Toward the end of the plaintiff's employment, however, their relationship was strained.

Gaulden was initially hired in a Service Order Solutions Audit/Billing Order Closure position, but, after her first week, she was moved to a new position as part of the "triage team," and her job title was "CSR Triage Processor." As Gaulden described it, the triage team looks at a list of orders and ensures that those orders have necessary documentation for billing. Gaulden's job was to communicate what additional information, if any, was needed before the orders could be moved to billing. Initially, the only other CSR Triage Processor and member of the triage team at Philips' Nashville office was Ellen Drake. (*See* Doc. No. 25-1, Gaulden Dep. 20.[1]) The plaintiff and Drake were being trained in the position by Shannon Kettells. (*Id.*) At a later point, Jennifer

---

[1] The copy of Gaulden's deposition transcript filed in support of the defendant's Motion for Summary Judgment is in condensed form, with four transcript pages per document page. The court will cite to the original transcript's pagination.

Moss became their trainer, and others, including Loren Givens, were added to the team. (*See* Gaulden Dep. 83–84.) Drake is White; Givens is Black.

The Philips office in which the plaintiff worked had an open floor plan in which approximately fifteen individuals worked, such that Gaulden's co-workers were seated in close proximity to her work station. Of the fifteen, approximately six or seven were African American. Most of her co-workers were on the billing team.

Philips has promulgated policies and procedures that prohibit discrimination and harassment and set forth various ways in which to report harassment. These policies define harassment, give examples of harassment, and instruct employees on how to report harassment in the workplace, so that Philips can investigate any reported discrimination and harassment and take remedial measures, if needed. While Gaulden does not recall whether she had training on Philips' policies pertaining to harassment and discrimination, she was aware that Philips had a Human Resources Department that could address employee concerns in the workplace. During her tenure at Philips, Gaulden had a number of interactions with the Director of Human Resources, Matt Holland.

### B.    Plaintiff's Conflict with Drake

The record establishes that Gaulden's teammate, Ellen Drake, had difficulty getting along with just about everybody. Gaulden testified that, from the beginning, she found Drake to be "testy a lot of times" and that she "came across [as] upset or easily upset by things." (Gaulden Dep. 31.) Drake "projected that onto other people," not only the plaintiff but "other teammates and trainers as well." (*Id.*) Drake had outbursts with "multiple" coworkers, male and female, White and Black, "where she would be inappropriate in the workplace." (*Id.* at 32–34.) Gaulden recalls talking with her coworkers about these outbursts. (*Id.* at 32–33; *see id.* at 33 ("Ellen was actually discussed on multiple occasions in the workplace because she would have outbursts often.").) Drake, however,

was not always "mean to everyone," and the plaintiff had "pleasant experiences" with her, up until the time that Drake had an "outburst" with Gaulden. (*Id.* at 33.)

On February 13, 2019, Gaulden and Drake had a verbal altercation at work (the "February 13 Incident"). According to Gaulden, she was sitting at her desk working when Drake "charged" toward her, threatening her, yelling, and cursing. (*Id.* at 55.) When Drake reached Gaulden's desk, she leaned onto her desk and "began shouting" at Gaulden about her frustration over some work they had both touched. (*Id.* at 56.) Gaulden stayed calm and asked Drake to back away. When Drake did not back off, Gaulden herself tried to back away from Drake, but Drake continued toward her, still yelling and cursing, "in a fighting stance" with "her fists balled." (*Id.*) Another employee, Pamela Hopson, stepped between them and persuaded Drake to return to her desk. Gaulden, although shaken and upset, remained at her desk and continued working. Drake continued yelling at her from across the room, but Gaulden did not respond or engage with her. Gaulden admits that Drake did not use any racial slurs or make any racially derogatory comments during this altercation. (Gaulden Dep. 60.)

Later the same day, Stithem sent an email to both Gaulden and Drake, the subject line of which was "Professionalism in the workplace." (Doc. No. 25-7, at 2.) The email stated that, per Stithem's conversation with both of them, they were "going to need to find a way to work as a cohesive unit." (*Id.*) Gaulden responded with a lengthy message, explaining her side of the story. (*Id.* at 1.) In relevant part, the email states:

> Today, Ellen had no regard for my personal space, my *multiple* requests to *give* me personal space or to lower her voice, she pointed her finger in my face, and stood over me. Not only was this not professional, it created a hostile work environment. I had to stand up at my own desk and back away because Ellen's unwarranted behavior did not cease. When . . . you included me in this email about professionalism in the workplace concerned me [sic]. I did absolutely everything in my power to de-escalate what took place this morning. You did not even get the

counts [sic] from my teammates . . . who witnessed this spiral out of control before addressing this . . . .

This is not the first, but the fourth time I have witnessed Ellen creating a hostile work environment. The first was when she was upset with the female teammates' reaction to her passing out print outs for something they were familiar with when she mentioned, "I'm from the streets and the hood I'm from, I'd punch someone in the throat if they piss me off." The second time when she aggressively addressed Miles Brooks for what she thought was a mistake. The trainer, Kristine[,] had to intervene . . . .The third on Wednesday, February 7, when Ellen began shouting on the office floor, "I'm tired of Kristine's sh*t and these smartass emails. I'm about to cuss her ass out!" and the fourth being what occurred today.

Ellen has constantly displayed aggressive behavior unprofessionalism, and it has progressively gotten worse. . . .

. . . . She continues to cross the line of professionalism and common courtesy.

(Doc. No. 25-7, at 1.)

The next day, on February 14, 2019, Gaulden sent an email to a supervisor named Amber Brown describing the February 13 Incident. She stated that Drake had approached her in a "hostile manner" and that this was the "fourth incident" of "hostile behavior from Ms. Drake" that she had witnessed, although the other three did not involve her. (Doc. No. 25-8.) She complained that Stithem had "failed to address" the problem. (*Id.*) She also asserted that Stithem had accepted Drake's account of the event before discussing it with Gaulden or any witnesses, and her "tone of voice and approach toward [Gaulden] was immediately biased." (*Id.*) After another teammate emailed Stithem, however, Stithem apologized to Gaulden. There was "still no resolution" of the problem, and Stithem's failure to appropriately address the problem combined with Drake's "progressively worsening behavior" made the plaintiff feel "unsafe in the work place." (*Id.*)

Human Resources Director Matt Holland conducted an investigation into the February 13 Incident. He outlined the results of his investigation in an email to Stithem and another supervisor, Sheryl Olson, dated February 20, 2019. Most saliently, as set forth in the email, Holland found that: "[m]ultiple individuals" had heard Drake say "inappropriate things (not directed at anyone in

particular)"; Drake had instigated the argument and been asked at least three times not to yell; she had refused to return to her seat when others had stood up and asked her to, responding that "no one will tell [her] what to do"; the team had "lost confidence" in Drake; and more than one person was now afraid of her, even though no one had ever witnessed physical violence or threats from her. (Doc. No. 25-9.) He recommended that Drake be given a verbal warning due to lack of professionalism. In addition, however, he recommended that Stithem or Olson have one-on-one conversations with both Drake and Gaulden about professionalism in the workplace, that all four "meet as a team and establish new ways of working together," and that it be made clear to both Drake and Gaulden that "if this continues from either side this could lead to continue [sic] escalated disciplinary action." (*Id.*)

Gaulden recorded her conversation with Holland in which she described the February 13 Incident, a partial transcript of which has been provided to the court. (Doc. No. 25-25.) In this conversation, Gaulden described to Holland the same four incidents outlined in her email to Stithem. She did not use the expression "hostile work environment" in her discussion with Holland, but she did describe Drake's complaining to several team members about a minor event that disproportionately upset Drake, prompting her to announce, "The hood that I'm from, if people piss me off, I'll punch them in the throat. I get down in the streets." (Doc. No. 25-25, Holland Tr. 9.)

On February 21, 2019, Gaulden sent an email to Stithem, complaining that Drake had arrived at work more than an hour before her shift was to start and had completed work on matters for which Drake and Gaulden were supposed to share responsibility, making it look like Drake was doing more work than Gaulden. (Doc. No. 25-10.) Gaulden reported, "I constantly feel sabotaged, especially when I have to defend my productivity compared to someone who goes

against what we've been instructed to do." (*Id.*) She asked Stithem to "please address this concern." (*Id.*)

On February 26, 2019, Gaulden sent another email to Stithem, referencing a conversation that had taken place the previous day in which Gaulden had reported that Drake was "working [the plaintiff's] part of the list" and still making it look like Gaulden was not doing her share of the work. (Doc. No. 25-11.) The email reflects that Stithem had sent out an email to the "entire team just in case" to address that behavior, but, despite that directive, Drake had continued to do work assigned to Gaulden. Gaulden asked Stithem to "address this concern again." (*Id.*)

On March 1, 2019, Gaulden sent an email to Stithem complaining that she had not received a response to her February 26 email and that Drake was continuing to do work assigned to Gaulden. (Doc. No. 29-5.) Gaulden reiterated her complaints that Stithem and Olson were not addressing this problem and that Gaulden had to "continuously work with some one who created and is *still maintaining a hostile environment*." (*Id.* (emphasis in original).) The plaintiff's perception was that Philips was "not concerned with what [she was] forced to deal with every day" and that Stithem was not willing to resolve the issue. (*Id.*)

On March 6, 2019, Gaulden emailed Stithem to report that Drake had called her a "child." (Doc. No. 25-13, at 2.) Later the same day, Gaulden emailed both Stithem and Olson to report another incident that had taken place that day, in which Drake had referred to her as a liar and again behaved toward her in a threatening and bullying manner. Gaulden stated that she had not felt "safe" in the office since the February 13 Incident and repeated her belief that Drake had "created a hostile work environment and continue[d] to fuel that hostility with misdirected anger." (Doc. No. 25-12.) In an email to Matt Holland the same day, Gaulden complained about Stithem's

and Olson's response to her complaints about Drake, which was basically to suggest that Gaulden change positions since she was the one who was uncomfortable. (Doc. No. 25-13, at 1.)[2]

### C.     The Plaintiff's Dispute with Loren Givens

On April 12, 2019, Gaulden emailed Stithem about difficulties that both she and a trainer, Jennifer Moss, were having with another coworker, Loren Givens, who is African American. (Doc. No. 25-14.) This email incorporated an IM thread between Moss and Gaulden, in which Moss stated that Givens "seems to think she knows everything" and would not listen to corrections from Moss, either, and recommended that Gaulden talk to Stithem if she could not "talk with [Givens] constructively." (*Id.* at 1.) Gaulden's email to Stithem also incorporated an email exchange between Gaulden and Givens, as an example of Givens' inability to take constructive criticism gracefully. (*Id.* at 2–7.) As Gaulden explained, she forwarded the communication to Stithem to "make her aware of what had been going on and . . . basically just to show her that [the plaintiff was] trying to communicate with Loren about something that [she] thought was . . . fairly simple and . . . shouldn't have been a problem, and that it took a left turn, so to speak." (Gaulden Dep. 83.)

When asked during her deposition how she and Givens were getting along at that point, the plaintiff stated that there was "basically a disconnect." (Gaulden Dep. 83–84.) She also described an incident when Givens sat next to her and attempted to instigate a conflict, as part of a purported plan to either to make Gaulden quit or to elicit an outburst so she could be fired for cause. (Gaulden

---

[2] The record indicates that Drake, at some point, was actually moved to another team, after which she and Gaulden no longer had any need to interact. (*See* April 24, 2019 email from S. Olson to M. Holland, Doc. No. 29-4 (noting that, by that date, Gaulden and Drake had "zero reasons to interact and they do not sit in viewing or speaking distance of each other").)

Dep. 93–95.) According to the plaintiff, after she was fired, another co-worker told her that this plan was hatched by Olson and Stithem, and Givens was asked to be a part of it. (*Id.* at 95.)

On April 19, 2019, Gaulden spoke with Stithem again about her interactions with Givens, which Stithem documented in an email to Matt Holland and Sheryl Olson. (Doc. No. 25-15.) According to Stithem, Gaulden had come to her to report that Givens was "coming at her" and to ask that Givens not speak to her any longer. (*Id.*) Stithem had then gone to talk to Givens to get her side of the story. Stithem then talked with Gaulden again, who reported that she felt like she had continued to bring problems to the attention of management, but nothing was ever done about them; that she was not getting adequate support from Stithem; and that Philips was not providing a safe environment. Stithem tried to discuss with Gaulden her coworkers' perception of her. She recalled telling Gaulden that she was alienating everyone on the team and that her coworkers had asked not to sit near her. Stithem said the conversation ended without any resolution of the issues. (*Id.*)

Holland responded by email on April 23, 2019 stating:

First, I am disappointed to hear Adriana [Gaulden] isn't teaming up with others. This is disappointing considering the steps taken thus far. I hate to hear you've had to experience this first hand. My ask for this note is to summarize in 5–7 bullets the behavior and recommendation of course of action. (include performance gaps where feasible) Please give me a compelling reason to take legal "for cause." I will be happy to speak with them and provide feedback.

(Doc. No. 29-2.)

That evening, Stithem sent Holland another email, claiming that

Adriana has repeatedly demonstrated in her manner and tone that she does not want to be part of a team. She seems to manipulate situations to get people upset with her and then plays the victim that she was "minding her own business" and they were the aggressors. I've had countless people on the team come to me asking for assistance in finding ways to work with her. She has flat out told me that she doesn't care to work with anyone. . . .[S]he recently told me when I asked her what I could do to bridge our gap, that it wasn't ever possible because when what happened with [Drake] happened it was never addressed and she could no longer trust me. When

I tried to discuss what she meant, she said moving her [Drake] to a different team address [sic] none of her issues and now she had a new team member [Givens] who I was allowing to "come at her." She is not reasonable and I am unable to find any common ground to build from. She told me that she wants to work isolated and asked that I keep others away from her. That her workspace did not feel like a safe space. When I tried to address the team perception and how people refused to sit with her she got very agitated and would not have a conductive [sic] conversation. She said I was throwing things in her face and she didn't appreciate what I was saying or how I was speaking to her. I've been told by a few people who have heard gossip that I need to watch my back, that she is keeping a log book and intends to use it against Philips. I believe Philips has done everything to help [Gaulden] be successful and productive, but she has had an agenda from the start and it doesn't matter what the action that is taken on our part, she will not find it to be satisfactory. This is not only my perception of the situation, but also of my manager. I don't see [Gaulden] ever assimilating to the team or being anything other than someone who creates drama and division. My desire is for her to be terminated based on her refusal to be part of a team and work cohesively with people that she supports and who count on her for support.

. . . . I honestly feel like this is going to continue to escalate until something happens. I do believe we need to act quickly.

(Doc. No. 29-3.)

Holland thanked Stithem for sharing and asked if she wanted to terminate for cause and, if so, on what grounds. (Doc. No. 29-4.) Olson, Stithem's supervisor, responded by stating that the "cause" for terminating Gaulden would be insubordination toward Olson and Stithem and unwillingness to work with team members. (Doc. No. 29-4.) She added, "Perhaps there is a role at Philips that allows a person to work solo with no team or customer interaction, but there isn't one in Service Operations." (*Id.*)

### D. The Plaintiff's Interactions with Human Resources

At some point around this same time (the date is unclear from the record), Gaulden was pulled into a meeting with Stithem and Olson, during which "Olson ordered [her], . . . via HR Director Matt Holland, to cease and desist from reporting anything else to HR." (Gaulden Dep. 96; *see id.* at 102 ("Matt Holland asked me to ask you to cease and desist from contacting HR.").)

According to Gaulden, this directive "confirmed that [she] was clearly upsetting individuals for reporting issues of race and hostile work environment to HR." (*Id.* at 97.)[3]

Asked during her deposition when she had ever made any reports about race to HR, Gaulden conceded that she "hadn't been able to directly report race to HR," and she "never told anyone in HR that [she was] being subjected to racial harassment or racial discrimination" (*Id.* at 97, 98.) However, she stated that she tried to talk to Holland several times but had not been able to and that, if she had been able to talk to him, she would have reported to him that she had heard that Drake had purportedly told someone else that she (Drake) was being "picked on by black girls." (*Id.* at 99.) Gaulden would also have told Holland that she was being treated as the aggressor in her relationship with Drake when, in reality, Drake was the aggressor. In addition, she recalled that, shortly after she was hired, Stithem had made a comment to her that the plaintiff "surprised her" because "black girls" were not usually as professional as the plaintiff was. (*Id.* at 100.) Gaulden interpreted this comment as "a backhanded compliment or a microaggression." (*Id.* at 101.)

### E. Plaintiff's Final Written Warning and Termination

On May 16, 2019, Gaulden was given a Final Written Warning. (Doc. No. 25-22.) Stithem, Holland and Olson presented her with this warning. This warning formally notified Gaulden that her role as part of the Service Order Solutions team required her to "team up with colleagues to

---

[3] Gaulden recorded this conversation. According to Philips, the transcript of that recording reflects that Olson actually told Gaulden, "Matt talked to me the other day and he wanted to convey the message that the [February 13] incident he investigated has been investigated. It's closed now and we just need to move on. Okay?" (Doc. No. 24, Def.'s Statement of Undisp. Fact No. 62 (citing (Doc. No. 25-23, Tr. of "Meeting with Shannon and Sheryl" at 3).) However, the transcript provided by the defendant in support of its motion is incomplete, and the cited portion has not been provided. (*See* Doc. No. 25-23.) The court, therefore, accepts as true the plaintiff's version of the conversation.

ensure completion of [her] responsibilities" and to "support[] the overall success of the team," but that she had "made it clear, both in actions and words," that she "refuse[d] to work cooperatively with the team. (*Id.* at 1.) The Warning documented instances of this behavior as follows:

- You had a conflict with an employee months ago, which was investigated and dealt with appropriately, but you have made it clear that you are unable to move on from this incident even though you no longer work with this employee. You have stated that the only satisfactory resolution is the other employee's termination, even though the behavior at issue did not merit that action.

- Your manager has made multiple attempts to engage with you but you respond with borderline insubordinate behavior (talking over, refusing to acknowledge coaching, etc.).

- Multiple team members have reported that they fear verbal altercations with you as you have repeatedly created tension and then turn it around to you being the victim.

- You pulled your manager from a business meeting over a minor issue of a colleague attempting to speak with you regarding work tasks; you are unable to have even the most basic of interactions with colleagues without conflict.

- Colleagues refuse to sit with you because you engage in passive aggressive behavior such as making faces, whispering about people and otherwise behaving in an immature way that creates an uncomfortable work environment.

- Two colleagues have reported that you even refuse to ride in the elevator with other team members.

- You have stated directly to your manager that you refuse to work with colleagues without a "3rd party" present during any interaction[.]

(*Id.* at 1.)

The Warning notified Gaulden that her "behavior has been disruptive in the office" and constitutes a "serious violation of Philips' ethics policy" and notified her that any future ethics violations would result in immediate termination of her employment. (*Id.* at 2.) She was directed to "immediately change" her behavior "to a teamwork focused, engaged attitude." (*Id.*) Gaulden refused to sign the Warning, because she did not feel that it was accurate.

Early the next morning, on May 17, 2021, Gaulden sent an email to Matt Holland requesting a private meeting to discuss "a reasonable accommodation for seating as it relates to the ADA." (Doc. No. 25-18, at 1.) The plaintiff continued, "I've seen the new seating chart, and though I'm not being insubordinate, my seating assignment does raise a few concerns." (*Id.*) In her deposition, Gaulden explained that she had been experiencing anxiety and depression over her work environment and, after speaking with her healthcare provider, determined that it would be "best if [she] was not seated with the individuals who were causing the anxiety and depression." (Gaulden Dep. 110.) Holland responded that there was a procedure to follow and a form to fill out in order to request an ADA accommodation. He attached the form to his email and explained to Gaulden that she needed to fill out the form, attach any "doctor supported documentation," and submit it for review. (Doc. No. 25-18, at 1.)

Gaulden's email to Holland was apparently prompted by her conversations with Stithem about seating assignments that took place on May 16 and May 17. Stithem asked Gaulden to sit between Givens and another coworker whose first name was Demondria and who, like Givens and Gaulden, is African American. Olson and Stithem were to be in the row behind Gaulden.

At 7:46 a.m., just ten minutes after Holland had forwarded the ADA accommodation form to Gaulden, Stithem emailed Gaulden (copying Holland) to notify her, per their previous discussion, that Gaulden could "move to a different place," but where she was currently sitting was not acceptable, because she was "sitting in another team's area." (Doc. No. 25-17.) In addition, she needed to sit with a teammate performing the same function as she was. Stithem added: "Per our meeting yesterday, I need you to be cooperative and work in a team manner. You have stated that you refuse to sit with your teammate as it's a hostile environment. It is not an option for you

not to sit where I've asked. Please indicate by reply all if you will comply with my seating request." (*Id.*)

Around the same time that morning, another employee, Stephanie Grady, emailed Holland and Stithem stating that she had been attempting to assign seats for her teams, but Gaulden was sitting in one of the spots allotted to Grady's team. Grady reported that she had asked Gaulden to please move to her assigned seat, and Gaulden refused, saying she was "in communication with [Stithem and Holland] and would not be adjusting until she heard from [them]." (Doc. No. 25-19.) She was reportedly "rude and disrespectful" in her interaction with Grady. (*Id.*)

Gaulden did not want to sit near Givens, Olson, or Stithem "because there was a history of unprofessionalism and hostile behavior from [Givens] and the other individuals that [she] would be seated around" (Gaulden Dep. 114), and these individuals were "directly involving in contributing to [Gaulden's] anxiety and depression" (*id.* at 112.) Gaulden admittedly had never had a problem with Demondria, but she was Givens' "cousin-in-law" and the two often went to each other's desks. (*Id.* at 113.) In addition, Stithem had told Gaulden that there was a rumor going around that Gaulden had called Demondria fat.

At 10:20 a.m. on May 17, 2019, Stithem emailed Gaulden, stating:

> I'm approving your time off request for later today, but per our previous conversations and email[, y]ou need to sit in your assigned seat on Monday when you come into the office. As we discussed, Triage is a team that does not function well without collaboration. My seating chart is based on keeping people that work in the same roles together for cross collaboration.

(Doc. No. 25-16.)

On Monday morning, May 20, 2019, Gaulden emailed Stithem to tell her that she was sitting where Stithem had placed her on Friday, rather than in her assigned seat between Givens and Demondria. She explained that she was "unable to sit between [Givens] and Demondria due to previous hostile encounters that were not handled appropriately." (Doc. No. 25-20.) She also

noted that she had "obtained the proper documentation from [her] healthcare provider . . . needed for seat arrangement approval" and would be forwarding that documentation to Holland promptly. (*Id.*) She followed up three minutes later with a second email to Stithem stating: "If you'd like to speak to me regarding this matter, please pull me into a private room instead of discussing this on the office floor." (*Id.*)

Gaulden was terminated the following day, on Tuesday, May 21, 2019. According to Stithem, Philips made the decision to terminate Gaulden based on her "refusal to sit where she had been asked to sit and her rude and disrespectful interactions with two managers about her seating arrangement." (Doc. No. 25-28, Stithem Decl. ¶ 12.) Stithem further explained that "[t]he fact that Ms. Gaulden acted in a such a manner only one day after being advised to work on a team-focused attitude let [sic] [her] to determine that Ms. Gaulden was simply never going to be able to work as part of a team with her coworkers." (*Id.*)

In its answer to the plaintiff's interrogatory asking, "What was the outcome of any and all investigations of complaints . . . of or regarding Plaintiff," Philips stated:

> [I]n May 2019 Loren Givens (African-American) submitted an internal complaint regarding Plaintiff. Givens complained that Plaintiff had been unprofessional towards her on multiple occasions, including an instance on April 19, 2019. The outcome of that complaint was that Plaintiff's employment was terminated.

(Doc. No. 29-1, at 5–6.)

This lawsuit followed.

## III.    ANALYSIS

### A.    Racially Hostile Work Environment

#### 1.    *Legal Standard*

Title VII prohibits an employer from "discriminat[ing] against any individual . . . because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). In

addition, Title VII "affords employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult" and thus prohibits harassing conduct that is "sufficiently severe or pervasive [as] to alter the conditions of the victim's employment and create an abusive working environment." *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 65, 67 (1986); *accord Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).

"For a race-based hostile-work-environment claim to survive summary judgment, the plaintiff must show (1) she belongs to a protected class, (2) she was subjected to unwelcome harassment, (3) the harassment was based on her race, (4) the harassment affected a term, condition, or privilege of her employment, and (5) the employer knew or should have known about the harassment but failed to take corrective action." *Singleton v. PSA Airlines, Inc.*, No. 21-3423, 2022 WL 875869, at *2 (6th Cir. Mar. 24, 2022) (citing *Khalaf v. Ford Motor Co.*, 973 F.3d 469, 482 (6th Cir. 2020), *cert. denied*, 141 S. Ct. 1743 (2021)).

The defendant argues here that Gaulden cannot establish the third, fourth, or fifth of these factors: that the "harassment" she complained of was "based on race," that it was sufficiently severe or pervasive to interfere with her work, or that Philips is liable for the alleged harassment. In response, the plaintiff concedes that her hostile work environment claim is not strong, as the actions she complains about "were not over a long period of time and did not occur daily." (Doc. No. 27, at 4.) However, she argues that Drake's conduct involved a "threat of physical violence" and, therefore, was sufficiently "severe" to create an intimidating and hostile work environment. (*Id.* at 4–5.) In addition, the plaintiff "believes" Drake's conduct toward her was "because of race" and that there is at least a question of fact for the jury as to whether it constitutes racial harassment. The plaintiff does not actually address the question of whether Philips can be liable for Drake's alleged harassment of the plaintiff.

Regarding whether the plaintiff can establish harassment "based on race," courts have repeatedly acknowledged that "Title VII does 'not prohibit all verbal or physical harassment in the work place; it is directed only at "discriminat[ion] . . . because of"' protected characteristics under the statutes." *Khalaf*, 973 F.3d at 484 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)). "Mere disrespect or antipathy will not be actionable under the statute unless a plaintiff can prove that such was motivated by discriminatory animus." *Id.* Thus, the "conduct of jerks, bullies, and persecutors is simply not actionable under Title VII unless they are acting because of the victim's [protected status]." *Id.* (quoting *Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 467 (6th Cir. 2012)).

Based on these principles, the court finds that the plaintiff fails to establish that any harassment she experienced was "based on race." First, the plaintiff's subjective belief that Drake's harassment of her was based on race, standing alone, is not sufficient to give rise to a jury question. The plaintiff admits that Drake never used racial epithets or slurs and that Drake harassed others as well as the plaintiff, irrespective of their race. According to the Sixth Circuit, "[c]onduct that is not explicitly race-based may be illegally race-based and properly considered in a hostile-work-environment analysis when it can be shown that but for the employee's race, she would not have been the object of harassment." *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 706 (6th Cir. 2007). Here, the plaintiff admits that Drake harassed many people, without regard to their race, as a result of which the plaintiff simply cannot show that, but for her race, she would not have been a target of Drake's ire.

The plaintiff points out that Drake referred to *herself* as being "from the streets" and announced: "the hood I'm from, I'd punch someone in the throat if they piss me off." (Doc. No. 25-7, at 1.) Although the plaintiff perceived this statement as having racial overtones, it was not

about the plaintiff or directed toward the plaintiff or any other person of color.[4] Likewise, the plaintiff later heard from someone else that Drake had claimed that she was being "picked on by black girls" (Gaulden Dep. 99), but the plaintiff did not witness this statement and it was not directed at her.[5] The plaintiff also complained about Loren Givens' behavior toward her, but Givens, like the plaintiff, is African American, and the plaintiff does not contend that Givens' treatment of her was based on her race.

In short, the evidence in the record would not permit a reasonable jury to conclude that the harassment the plaintiff received from Drake—or anyone else—was "based on race." This conclusion alone compels summary judgment in favor of the defendant on the plaintiff's hostile work environment claim. In addition, however, the court also finds that the plaintiff's claim fails to establish that Philips should be liable, even if Drake's harassment were racially motivated.

In the context of coworker harassment, the question raised by the fifth element of the plaintiff's *prima facie* case is whether the employer, once it was notified of the harassment, "implement[ed] prompt and appropriate corrective action." *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 516 (6th Cir. 2009) (quoting *Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999)). "[W]hen coworker harassment is at issue, an employer is . . . liable 'if its response manifests indifference or unreasonableness in light of the facts the employer knew or should have known.'" *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 338 (6th Cir. 2008) (quoting *Blankenship v. Parke Care Ctrs., Inc.*, 123 F.3d 868, 872–73 (6th Cir. 1997)). Whether a response is effective is "measured not by the extent to which the employer disciplines or punishes the alleged harasser, but rather if the steps

---

[4] As the defendant points out, "[p]eople of all races can grow up in poor, rough neighborhoods." (Doc. No. 30, at 3 n.1.) Drake's statement was not demeaning toward anyone but herself.

[5] It appears that Philips did not learn about that allegation until taking the plaintiff's deposition in connection with this case.

taken by the defendant halt the harassment." *Stacy v. Shoney's, Inc.*, 955 F. Supp. 751, 756 (E.D. Ky. 1997), *aff'd*, 142 F.3d 436 (6th Cir. 1998).[6]

Here, the primary event upon which the plaintiff's harassment claim is based is the February 13 Incident during which Drake invaded her personal space, refused to back off when asked to do so, and yelled and cussed at her. After Gaulden complained about Drake's February 13 "outburst," Philips investigated, issued a written report finding Drake at fault for the incident, and issued written discipline to Drake. When the plaintiff continued to complain about Drake's conduct, Philips ultimately moved Drake to a different team, so she and the plaintiff did not have to interact with each other. The plaintiff did not believe that this action was adequate to address her concerns, but she has not presented evidence from which a jury could conclude that Philips failed to take "prompt and appropriate corrective action." *Barrett*, 556 F.3d at 516.

The defendant is entitled to summary judgment on the plaintiff's racial harassment/hostile work environment claim.

### B.      Retaliation

Title VII prohibits an employer from retaliating against an employee because that individual "opposed any practice made an unlawful employment practice" under Title VII. 42 U.S.C. § 2000e–3(a). Where, as here, a plaintiff has only circumstantial evidence of retaliation in violation of Title VII, courts apply the three-part burden-shifting framework developed by the

---

[6] The defendant also argues that the plaintiff's harassment claim is barred under *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998), and *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998). *Faragher* and *Ellerth*, however, establish an affirmative defense available to an employer when a plaintiff proves supervisor harassment *and* the defendant can show that the plaintiff did not suffer a "negative tangible employment action." *Clark v. United Parcel Serv.*, 400 F.3d 341, 348 (6th Cir. 2005). Here, the plaintiff does not allege supervisor harassment. More to the point, she clearly suffered a "negative tangible employment action," so the affirmative defense would not be available to Philips anyway.

Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to determine whether the plaintiff has proffered sufficient evidence to survive summary judgment. *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014).

Under the *McDonnell Douglas* framework, the plaintiff bears the initial "burden of establishing a *prima facie* case of retaliation. *Id.* Once the plaintiff establishes the elements of her *prima facie* case, "'the burden of production of evidence shifts to the employer to articulate some legitimate, non-discriminatory reason for its actions. If the defendant satisfies its burden of production, the burden shifts back' to [the plaintiff] to demonstrate that [the defendant's] proffered reason was not the true reason for the employment decision." *Id.* (quoting *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007). "Although the burden of production shifts between the parties, the plaintiff bears the burden of persuasion through the process." *Id.*

1.      *Gaulden's Prima Facie Case*

To establish a *prima facie* case of retaliation under Title VII, Gaulden must "point to evidence sufficient to convince a jury that: (1) she engaged in activity protected under Title VII; (2) [the defendant] knew that she exercised her protected rights; (3) an adverse employment action was subsequently taken against her; and (4) [the plaintiff's] protected activity was the but-for cause of the adverse employment action." *Kenney v. Aspen Techs., Inc.*, 965 F.3d 443, 448 (6th Cir. 2020) (citations omitted).

Philips asserts that the plaintiff cannot establish that she engaged in protected conduct or that there was a causal connection between the allegedly protected conduct and the adverse employment action. In response, the plaintiff argues that, by using the words "hostile work environment," she conveyed her understanding that Drake's behavior was racially hostile and that,

consequently, the defendant knew or should have known that she was reporting racial harassment, thus engaging in protected activity.[7]

To come within the protection of Title VII, the plaintiff must establish that she challenged an employment practice that she reasonably believed was unlawful under Title VII. *Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 645 (6th Cir. 2015). While a "vague charge of discrimination" will not satisfy this requirement, the law "does not . . . require that the plaintiff's complaint be lodged with absolute formality, clarity, or precision." *Id.* (quoting first *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1313 (6th Cir. 1989), and then *Stevens v. Saint Elizabeth Med. Ctr., Inc.*, 533 F. App'x 624, 631 (6th Cir. 2013)).

In *Yazdian*, the court found that the plaintiff satisfied his burden of showing that he had engaged in protected activity by opposing unlawful employment practices by allegedly

---

[7] In its Reply, Philips argues, among other things, that the plaintiff's failure to address the issue of causation constitutes a concession that she cannot establish this element of her *prima facie* case, thus warranting summary judgment. It is true that the Sixth Circuit has repeatedly stated—in unreported opinions—that "a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment." *Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) (citations omitted). In reported opinions, however, the Sixth Circuit has made it clear that a district court faced with a plaintiff's failure to respond, in whole or in part, to a motion for summary judgment "[may] not use that [failure] as a reason for granting summary judgment without first examining all the materials properly before it under Rule 56(c)." *F.T.C. v. E.M.A. Nationwide, Inc.*, 767 F.3d 611, 630 (6th Cir. 2014) (quoting *Smith v. Hudson*, 600 F.2d 60, 65 (6th Cir. 1979)). The district court retains this obligation, because "[a] party is never required to respond to a motion for summary judgment in order to prevail since the burden of establishing the nonexistence of a material factual dispute always rests with the movant." *Id.* (quoting *Smith*, 600 F.2d at 64). Consequently, despite a plaintiff's silence in response to the defendant's arguments, the court "must review carefully the portions of the record submitted by the moving party to determine whether a genuine dispute of material fact exists" before granting summary judgment on those particular claims. *Id.*

As set forth below, the court finds that the plaintiff fails to show that she engaged in protected activity and, therefore, that she cannot state a *prima facie* case of retaliation. The court, therefore, does not reach the element of causation. If the plaintiff had established that she engaged in protected conduct, however, there would likely be sufficient evidence in the record to give rise to an inference of a causal connection between her repeated complaints about her coworkers and her termination.

complaining about discrimination on multiple occasions. In particular, the court pointed to six statements the plaintiff had made to his supervisor "which individually and together qualify as Title VII protected activity," including several references to hiring an attorney and bringing a lawsuit, as well as a statement characterizing his work environment as a "hostile work environment." *Id.* at 646. The court concluded that "these statements—particularly the hostile-work-environment charge—put [the defendant] on notice that [the plaintiff] believed [his supervisor's] conduct was illegal." *Id.* As the court explained:

> "Hostile work environment" is a term of art, which refers to an unlawful employment practice under Title VII that arises because of "discriminatory intimidation, ridicule, and insult[s]" repeatedly directed at an employee on the basis of a protected characteristic. Thus, an employee who complains that an employer is creating a "hostile work environment" engages in Title VII protected activity *when the context objectively reveals that the employee is using the expression to complain about repeated abusive discriminatory comments or treatment*. A reasonable jury could conclude that [the plaintiff] used and intended the phrase "hostile work environment" to reference discriminatory treatment because he was aware of the legal significance of the term and meant it to be a complaint about national-origin or religious discrimination.

*Id.* (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115–16 (2002)) (emphasis added); *accord McGruder v. Metro. Gov't of Nashville & Davidson Cty.*, No. 3:17-cv-01547, 2020 WL 4586171, at *7 (M.D. Tenn. Aug. 10, 2020) (Trauger, J.) ("[A]s in *Yazdian*, the context of McGruder's statements strongly suggests that she was using the term 'hostile work environment' to refer, not only to intolerable working conditions caused by the rude and unprofessional behavior, poor leadership, and lack of discipline at the school, but also to 'repeated abusive discriminatory comments or treatment' against the teachers as well as the students." (quoting *Yazdian*, 793 F.3d at 646)); *see also Mumm v. Charter Twp. of Superior*, 727 F. App'x 110, 113 (6th Cir. 2018) (holding that a jury could find that the plaintiff had engaged in protected activity, where she complained that she would file a lawsuit against the defendant if it did not "rectify 'the pay discrimination'" between her and another employee who happened to be male, even though she

did not use the phrase "sex discrimination" or "otherwise make explicit that she believed gender explained the pay disparity").

In this case, the plaintiff initially testified in her deposition that she never complained to anyone at Philips that Drake treated her differently because of her race, that Drake never made racially insensitive comments or racial slurs toward her, and that she never heard Drake use racial slurs toward anyone. (Gaulden Dep. 67.) It is undisputed, however, that Gaulden used the term "hostile work environment" on several occasions in her communications with Stithem and other supervisors.

Specifically, in her February 13, 2019 email to Stithem, Gaulden described Drake's conduct toward her (during the February 13 Incident) and on three other occasions (that did not involve her) as "creat[ing] a hostile work environment." (Doc. No. 25-7, at 1.) The other three occasions, as Gaulden described them, involved (1) Drake's being "upset with the female teammates' reaction to her passing out prints for something they were familiar with when she mentioned, 'I'm from the streets and the hood I'm from, I'd punch someone in the throat if they piss me off'; (2) Drake's "aggressively address[ing] Miles Brooks for what she thought was a mistake"; and (3) Drake's "shouting on the office floor, 'I'm tired of Kristine's sh*t and these smart ass emails. I'm about to cuss her ass out!" (*Id.*)[8]

Gaulden used similar language to describe the same four incidents in an email dated February 14, 2019 to a different supervisor. (Doc. No. 25-8.) In a March 1, 2019 email to Stithem, Gaulden complained about Drake's continuing to do work that was assigned to Gaulden, thus intentionally trying to make Gaulden look bad, and she stated that it was "stressful and frustrating" to "continuously work with some one who created and *is still maintaining a hostile environment*."

---

[8] The race of the "female teammates," Miles Brooks, and Kristine is not in the record.

(Doc. No. 29-5 (emphasis in original).) She added that it was "clear" that "Philips is not too concerned with what I'm forced to deal with everyday." (*Id.*) Several days later, on March 6, 2019, she again complained in an email to Stithem, copied to Olson, that Drake had "created a hostile work environment and continue[d] to fuel that hostility with misdirected anger." (Doc. No. 25-12.) The incident that formed the basis for this last complaint was Drake's "glaring" at her while she was training Loren Givens at the desk next to Gaulden's and later slamming things around her own desk and stating that she was not going to sit near "someone who has 'lied on her,'" which Gaulden understood as a reference to herself. (*Id.*) She also reported that Drake later walked over to the plaintiff's area, pushed a chair out of the way, and demanded to know if they "ha[d] a problem," while taking an aggressive and threatening posture. (*Id.*) She described Drake's conduct as continuing to be "harassing and bullying." (*Id.*)

Finally, on May 20, 2019, Gaulden emailed Stithem to tell her that she was "unable to sit between [Givens] and Demondria"—both of whom are African American—"due to previous hostile encounters that were not handled appropriately." (Doc. No. 25-20.)

In her Declaration, which was prepared in response to the Motion for Summary Judgment, the plaintiff states that she "believe[s]" that Drake "threatened and intimidated [her] because of [her] race." (Doc. No. 29-14, Gaulden Decl. ¶ 2.) She also asserts that, by using the language "hostile work environment" when she communicated to her supervisors about Drake's behavior, she "meant to communicate" her belief that "the behavior [she] was complaining about violated the civil rights law." (*Id.* ¶ 5.) She declares that she did not believe it was necessary to say "racially hostile," because it was obvious that she was a member of a protected class and, "[a]s an African American complaining about a hostile work environment where a white employee was threatening and wanting to fight me, it appeared obvious that it was based upon race." (*Id.* ¶ 7.)

The court finds that this case is distinguishable from *Yazdian* for multiple reasons, and that, as a result, the context does not support a conclusion that the plaintiff's use of the term "hostile work environment" establishes that she engaged in protected activity. First, aside from the plaintiff's use of the words "hostile work environment," there is absolutely no evidence that Drake's conduct had anything to do with race. While Drake referred to *herself* as being from the "hood," she never accused anyone else of being from the "hood" and was never overheard to use racial epithets or slurs. Second, the plaintiff has conceded that Drake engaged in "hostile" behavior toward lots of other coworkers, irrespective of race. The plaintiff described to her supervisors three other incidents in which she perceived Drake has behaving in a hostile manner, but none of them involved the plaintiff and none of them appears to have had anything to do with race. The race of the individuals to whom Drake's behavior was directed, in fact, is not in the record. And finally, the plaintiff also referred to Loren Givens' behavior toward her as "hostile" (Doc. No. 25-20), but Gaulden admits that Givens' behavior had nothing to do with race, and Givens is also African American. In light of the entire context, there is simply insufficient evidence to permit a jury to conclude that the plaintiff engaged in protected conduct simply by using the words "hostile work environment."

Moreover, in light of Drake's angry outbursts toward both Black and White co-workers and the plaintiff's characterization of Givens' conduct as "hostile," the record supports the conclusion that Philips did not know, and had no reason to know, that the plaintiff subjectively believed she was complaining about *racial* harassment as opposed to run-of-the-mill rude and unacceptable behavior. In her email dated May 16, 2019, Stithem acknowledged that Gaulden had complained about a "hostile environment" (Doc. No. 25-17), but the teammate she specifically refused to sit near at that time was Givens.

The court, in sum, finds that the plaintiff cannot establish a *prima facie* case of retaliation, because she cannot show that she engaged in protected conduct or that the employer knew that she had engaged in protected conduct.

### 2. Pretext

Even if the plaintiff could establish a *prima facie* case of retaliation, she cannot rebut the defendant's non-retaliatory reason for her termination.

Philips gave Gaulden a "Final Written Warning" on May 16, 2019, describing the conduct in which she had engaged that Philips deemed unacceptable, including, among other things, that she was "unable to have even the most basic of interactions with colleagues without conflict," that her colleagues refused to sit near her because she "engage[d] in passive aggressive behavior" that "create[d] an uncomfortable work environment," and that, when her supervisors tried to discuss these issues with her, she responded with "borderline insubordinate behavior." (Doc. No. 25-22, at 1.) Gaulden was advised that her behavior needed to "immediately change to a teamwork-focused, engaged attitude." (*Id.* at 2.) When the plaintiff subsequently continued to refuse to sit in her assigned work area, she was terminated. Philips states that it made the decision to terminate Gaulden's employment based upon her refusal to sit where she had been asked to sit, her rude and disrespectful interactions with two managers about her seating arrangement, and the fact that she engaged in this behavior one working day after being advised to work on a "team-focused attitude." (Doc. No. 25-28, Stithem Decl. ¶ 12.).

The plaintiff's burden to show pretext "merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination." *Burdine*, 450 U.S. at 256. "Thus, on summary judgment, in evaluating pretext and the plaintiff's ultimate burden, the court should consider all probative evidence in the light most favorable to the plaintiff, including the evidence presented in the *prima facie* stage." *Jackson*, 814 F.3d at 779 (citing *Reeves v. Sanderson Plumbing*

*Prods., Inc.*, 530 U.S. 133, 147 (2000) ("Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination.")).

"Put simply, the 'commonsense' question here is: 'did the employer fire the employee for the stated reason or not?'" *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 326 (6th Cir. 2021) (quoting *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009)). The Sixth Circuit recognizes that "[p]laintiffs typically show pretext in one of three ways: (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that the proffered reasons were insufficient to motivate the employer's action.'" *Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 888 (6th Cir. 2020) (quoting *Chen*, 580 F.3d at 400). However, these three categories are not the exclusive means by which a plaintiff can show pretext. Rather, they are simply a "convenient way of marshaling evidence and focusing it on the ultimate inquiry: 'did the employer fire the employee for the stated reason or not?'" *Id.* (quoting *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012)). Regardless of what course she takes, the "plaintiff must articulate some cognizable explanation of how the evidence she has put forth establishes pretext." *Id.*

In support of her argument that the reason given for her termination is pretextual, the plaintiff points to Philips' answer to an interrogatory that asked, "What was the outcome of any and all investigations of complaints concerning the complaints of or regarding Plaintiff?" [sic]. (Doc. No. 29-1, at 5.) As set forth above, the defendant answered:

Please see Defendant's response to Interrogatories Nos. 2 and 4 above.[9]

---

[9] Interrogatory No. 2 asked "When and how was Defendant put on notice that an employee of Defendant engaged in, or was engaging in, behavior that may be offensive to Plaintiff." (Doc. No. 29-1, at 3.) Philips' answer described the verbal altercation between Gaulden and Drake, Human Resource's involvement in the investigation of that event and the resulting formal Verbal

> Additionally, in May 2019, Loren Givens (African-American) submitted an internal complaint regarding Plaintiff. Givens complained that Plaintiff had been unprofessional towards her on multiple occasions, including an instance on April 19, 2019. The outcome of that complaint was that Plaintiff's employment was terminated.

(*Id.* at 5–6.) The plaintiff insists that this "sworn" answer conflicts with Philips' alleged reason for her termination as provided in its summary judgment documents and the Declaration of Shannon Stithem. (Doc. No. 27, at 8.) She also argues that it is clear that "Defendant had been planning and searching for a reason to terminate Plaintiff long before the alleged insubordination pertaining to the seating arrangements ever arose" and that "the refusal to sit in a particular seat was a plan to get Plaintiff terminated, while another employee moved without being terminated." (*Id.*)

The defendant's answer to Interrogatory No. 5—which did not ask why the plaintiff was terminated but what the ultimate outcome of an investigation was—does not conflict with Philips' proffered reason for its action. The investigation of Givens' complaint about the plaintiff, in conjunction with the plaintiff's continuing to complaint about Givens and her refusal to sit near her, did culminate in the plaintiff's termination. Moreover, the fact that the plaintiff's supervisors had been unhappy with her behavior and her conduct for some period of time does not obviate or conflict with their conclusion that the plaintiff's continued refusal to work with her teammates, after having been given a final written warning advising her to do just that, was the final straw that warranted her termination for cause.

The plaintiff also asserts that her termination must be pretextual, because Givens was not terminated after she changed seats without authorization. (*See* Doc. No. 27, at 4 ("The Summary

---

Warning given to Drake, and Gaulden's continued complaints about Drake. (*Id.* at 3–4.) Interrogatory No. 4 asked who investigated the plaintiff's allegations about another unnamed "employee." (*Id.* at 5.) Philips answered that Matt Holland investigated the altercation between Drake and Gaulden. (*Id.*)

Judgment stated reason . . . is inconsistent with the way Loren Givens . . . was treated.").) In support of this argument, Gaulden points to Givens' March 22, 2019 email to Stithem stating:

> I have moved my seat into Ellen[ Drake's] old desk. Honestly, my prior arrangement is no longer conducive for production or team work. Adriana [Gaulden] and Pam have become a distraction with the "loud" whispering, heckling and purposeful loud conversations that often give off negative energy. Personally, I don't have time for the nonsense. I hope you understand.

(Doc. No. 29-13.) The fact that Givens was not terminated after she changed seats without seeking prior approval (and while complaining about Gaulden's conduct) does not establish that the defendant's proffered reason for terminating Gaulden is untrue, did not actually motivate the decision, or was insufficient to motivate the decision to terminate Gaulden. *See Miles*, 946 F.3d at 888. It does not even establish that the defendant's treatment of Givens was inconsistent with its treatment of Gaulden. Givens' email was apparently at least part of what prompted an investigation into the plaintiff's behavior. Moreover, there is no evidence that Givens refused to sit where she was asked once she was directed to return to a seat next to Gaulden, that Givens was rude and "borderline insubordinate" to supervisors, or that she was perceived as generally stirring up controversy in the work place.

The plaintiff, in sum, presents no evidence suggesting that Philips' rationale for terminating her is pretextual. Philips, as a result, is entitled to summary judgment on the retaliation claim on this basis as well.

To be clear, this is not to say that Philips' treatment of the plaintiff was necessarily fair or even-handed. The fact remains, however, that the plaintiff was an at-will employee, and Philips remained free to terminate her for virtually any reason, or no reason at all, so long as she was not terminated for an unlawful reason. *See Oncale*, 523 U.S. at 80–81 (1998) (reiterating that Title VII is not a "general civility code for the American workforce"). On the record before this court, the evidence submitted by the parties does not remotely support the plaintiff's claim that she suffered

racial harassment or a racially hostile work environment, that she complained about racial harassment, or that she was terminated for complaining about racial harassment.

## IV.    CONCLUSION

For the reasons set forth herein, the court will grant the defendant's Motion for Summary Judgment. An appropriate Order is filed herewith.

ALETA A. TRAUGER
United States District Judge